May it please the Court, my name is Amos Twanye, and along with my co-counsel Matthew Campbell, and under the supervision of Professor Maureen Laughlin, we represent the appellant in this case, Marcus Matthews. At this time, I ask the Court to please reserve two minutes for rebuttal. Thank you, Your Honor. We are sharing the podium today. Mr. Matthews brings forward two issues for your review. Mr. Campbell will address Mr. Matthews' ineffective assistance of counsel to me, and I will address Mr. Matthews' due process claims, first as interpreted by Napu v. Illinois, and second as interpreted by Brady v. Maryland. Regarding Napu, the principle that a State may not knowingly use false or misleading evidence is implicit in any concept of ordered liberty. The State violated this principle when it obtained Matthews' conviction for the use of misleading evidence that directly resulted in a false factual finding.  Here, the State trial court expressly found that the validity of an unsigned warrant the State executed through intentional deception. The State knew this to be false and yet said nothing to correct the record. This false factual finding was a direct result from the State's use of misleading affidavits. Well, Matthews' counsel – all Matthews' counsel had to do was just ask. That is correct, Your Honor. However – What's the discrepancy here? Why do we have this discrepancy on the warrant and the affidavit? Did he ask that question? No, Your Honor. He did not. He had the affidavit, right? He had all of the paperwork in front of him. Yes, he did. He had the affidavit. He looked through the warrant file. Yes, Your Honor. He talked to the judge. Yes, he did. However – So why is that misleading? Well, it is misleading in the fact that the State came into court and affirmatively argued that they had a valid warrant on January 13th, when, in fact, they did not. Why – how would they have known that, in fact, it wasn't valid when the case had yet to be decided that the wrong date was invalidated, the search warrant? Yes, ma'am. Matthews 2 and Matthews 3 both touch on the fact that this is a new area of judicial impression. However, you do not need judge-made law to have clearly defined law. And Matthews 2, which is still good law in the State of Idaho, represents the fact that this has not been challenged before solely because the result was preordained. And I think nowhere is it more evident in the State's knowledge that they needed a signature on the warrant than in Corporal Green's own actions. Well, it's one thing for the – you're right, the statute is pretty clear. There's a series of statutes. Correct. Three statutes. But it's not so clear that the courts wouldn't have interpreted a situation like this as a clerical error or that they would not have said that, you know, that suppression was not necessary. That is correct, Your Honor. However, this ceased to be a simple clerical error when the State entered into cover-up mode. Specifically, we have Corporal Green returning to the reviewing magistrate the day after the search to have him sign and date the warrant. Wait. And that goes back to the original question. I have it in front of me, and it's clear that you have the 13th of January as the date of the search, and then you have the 14th of January as the date that the magistrate judge signed. Why didn't the counsel simply ask, instead of either, you know, making the choice to assume that if it were a clerical error, it had no legal significance? Yes, Your Honor. And we are arguing that counsel was ineffective, and we do believe that he was unreasonable in not inquiring further into this. However, two precedents that this Court has handed down in Belmont v. Woodford and also Commonwealth v. Northern Mariana Islands expressly holds that the State's duty to correct false or misleading evidence is separate from the State's duty to provide the defendant with knowledge. The express language used in Commonwealth and Belmont case is the State has a freestanding constitutional duty to act when he's put on the notice of a real possibility of false evidence. Again, this is regardless of defense counsel's knowledge, and this is regardless of good faith or bad faith of the prosecution. Well, I mean, if we look at this realistically, there was a technical mistake. If it had been called to anybody's attention, it would have – the judge would have issued the – would have signed it. Do you have any United States Supreme Court case saying failure to disclose a technical mistake as to a warrant invalidates the warrant? Your Honor, I do not. However, I have to respectfully – Well, that's the way you have to go by, isn't it? It is, Your Honor. However, I have to respectfully disagree with your characterization that this is simply a clerical mistake. If a close reading of the State's affidavits, briefs and live testimony given by Corporal Green, they come into the court and they argue affirmatively that they have a valid warrant. Now, the State is under a duty to ascertain the veracity of the statements they make in court. If there was – if this was a new area and there was some question as to whether or not they needed a signature on the line of the warrant, then I argue that they have a heightened duty to come in, expose the clerical – Well, why? Why? It's just – it's something that doesn't go to the substance of anything, does it? Actually, Your Honor, again, I have to respectfully disagree with that characterization. The State's own briefs expressly state that all of the physical evidence connecting Mr. Matthews to the crime scene within the State's possession was seized under this exception of Corporal Green. As such, if suppressed, this evidence directly calls into question the State's ability to prove Mr. Matthews' guilt beyond a reasonable doubt. Well, they had gone to a judge, they provided an affidavit, the judge had orally approved it, and they just failed to put his name on it. Again, Your Honor, I think the most telling example of where the State failed their duty in this case is in the testimony of Corporal Green. Specifically on page 27 of your excerpts of records, in lines 4 through 7, Corporal Green is expressly asked, are these photocopies of the search warrants which were issued on January 13th? Corporal Green responded, yes, when in fact he was there personally when the judge signed and issued the warrant on January 14th. He knew this to be false. In Kyle's v. Whitley, the United States Supreme Court case stands for the proposition that the State is imputed with the knowledge of all of the representatives acting on its behalf. As such, they are imputed with all of Corporal Green's knowledge that the homeowner immediately challenged the warrant for its lack of signature, that he had to result to intentional deception to gain access to the home. So when he testifies falsely at that suppression hearing, the State has an affirmative duty to correct the record. This is separate from their obligation under Brady to disclose the evidence to the defense. This is a freestanding constitutional duty the State has as an officer with the court to protect the court from false or misleading evidence. Also, a close reading of Commonwealth v. Bowie and Belmonte's reveals that the prosecutor cannot, and I'm quoting this court, "...forge ahead in a good-faith effort or finesse the problem by pressing ahead without a diligent and good-faith attempt to resolve it. A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts." Here, it is plain and simple. The prosecutor failed to investigate the veracity of the information they put forth, and they allowed their own representative to testify falsely on this stand. As such, they failed their duty under Napubi, Illinois. Now, in its decision affirming Mr. Matthews' conviction in Matthews III, the Idaho Supreme Court not squarely addressed the State's use of these misleading evidence, nor did it squarely address Corporal Green's misleading testimony. Most telling was Matthews III failed to address the false factual finding reached by the trial court and the State's silence to correct the record. As such, if there was an application of Napubi, Illinois, it was objectively unreasonable. And I'm quoting the district court's holding on page 270 of your excerpts of records. And he expressly says that the Idaho Supreme Court did not address NAPU separately from Brady. And he goes on in the last paragraph of that page to say, while the Idaho Supreme Court did not perform a clear NAPU analysis, it is clear that it was not an unreasonably objective application. The district court opinion expressly states that the Idaho Supreme Court did not squarely address the NAPU issues. As such, arguably, the Matthews-NAPU claim could be separate from the AEDPA review, and this Court could review it de novo for clear error. Regardless, the Idaho Supreme Court's application was objectively unreasonable in failing to address where the State failed to correct the record. If there are no further questions at this time, I will turn the podium over to Mr. Matthews and turn it over to my co-panel. As regards to Mr. Matthews' ineffective assistance of counsel claim, the facts are undisputed. Trial counsel had in his possession a search warrant under which all of the physical evidence linking Matthews to the crime was seized. This warrant was dated on January 14, 1992, when Matthews' trial counsel knew that the search actually took place on January 13, 1992. Rather than undertake any investigation or ask the question why, trial counsel simply assumed that the judge signed the warrant on January 13 and merely wrote down the wrong date. The Idaho Supreme Court's decision is objectively unreasonable because it holds that Matthews' trial counsel's representation was effective, despite the fact that he chose not to investigate without a strategic or tactical reason. Well, he had met with the – I think after he – shortly after he was assigned the case, he obtained the warrant file, reviewed it, looked at the affidavit, and I think there's some point along the way he makes a statement that he read the affidavit and in his mind there was sufficient facts in the affidavit to constitute probable cause to search. He talked to the – to the judge that issued the warrant. That's correct. And then at the – it was not until after he makes the decision to file the motion to suppress on grounds that they improperly entered the reservation. At the hearing, he says it's right before the hearing or right after the hearing he realizes that the dates are different. And then he thought, well, it's a clerical mistake. That's correct, Your Honor. But what's ineffective about it? What's incompetent about that or not even competent? He made the decision not to pursue it any further. All of trial counsel's investigation concerning the Indian sovereignty issue was completed by the time that he noticed the facial irregularity on the search warrant. At the time he noticed the facial irregularity, he chose at that point not to investigate it. This was well before Matthews pleaded guilty and was advised to plead guilty by trial counsel. When he noticed it, he simply undertook no investigation only because he made a mistaken assumption. He had no strategic or tactical purpose behind his decision. The record has the affidavit of David Nevin, who's a recognized expert in the field of Idaho criminal law, and he's testified that this behavior, that not asking the question of why the warrant was dated after the date of the actual search, fell outside the wide range of professional norms of defense counsel in Idaho. The Idaho Supreme Court also uses the status of the law as a basis to excuse trial counsel's lack of investigation. It's important to note that trial counsel did not put this forward as a reason himself. He was just laboring under a mistaken assumption. So he didn't even know that the warrant wasn't signed at the time that it was executed. However, even if he had, the status of the Idaho law was clear. The statutes, Idaho 4401, 4406, and 4407, all explicitly require a search warrant to have a signature. Well, it had never been interpreted by any of the Idaho appellate courts. That's correct. The State had never urged the courts of Idaho to approve a warrant that wasn't signed. Or to recognize a clerical mistake. That's correct, Your Honor. Judge Noonan pointed out here this really is nothing more than a clerical mistake, because at the time that the affidavit was presented, there's no question but the magistrate judge determined that there was probable cause and signed off on the affidavit. He just failed to sign the warrant. That's correct. In Matthews 2, the Idaho Supreme Court held the evidence seized in this case would have been held inadmissible. And the basis for that decision was the Idaho Constitution and Idaho statutes. The Idaho statutes we just mentioned, the Idaho, the requirement that search warrants maintain that conform strictly with the Idaho Constitution and the Idaho statutes has been the law in Idaho since the case Pookie v. Mabee, which was decided in 1920. And that's still good law today. And, again, trial counsel did not put this forward as a basis for his decision not to investigate the why the warrant was dated. Trial counsel's experience and contacts with both the magistrate and the officer in this case underscore the multiple opportunities that trial counsel had to test his presumption. For example, at the April 30, 1992 suppression hearing, he cross-examined the issuing magistrate. He showed him a copy of the warrant and asked him to identify his signature. Despite the date being only a few inches away and despite his noticing this, he failed to ask the critical question why. Did you say it would not have been admissible or would have been admissible? This evidence was held to not be admissible. The Idaho Supreme Court in Matthews II held that had trial counsel properly filed a motion to suppress, all of this evidence would have been held inadmissible. The state also urged this court to not find prejudice by adopting the holding of the Seventh Circuit in Holman v. Page. That case disregards the majority of the United States Supreme Court in Kimmelman v. Morrison, which directly addressed the issue of whether prejudice could be found when trial counsel deficiently fails to follow a suppression. Instead, the Seventh Circuit in Holman v. Page relied on the concurring opinion of Justice Powell. Appeals courts are not free to choose between the majority opinion and the concurring opinion. Furthermore, Holman v. Page is based on a misreading of Lockhart v. Fretwell. Justice O'Connor, who joined the majority opinion in Lockhart v. Fretwell, wrote separately to make clear the point that Lockhart v. Fretwell was not meant to change the normal prejudice analysis. In other words, the result must have been different. In this case, the facts clearly demonstrate that the result would have been different. But we know that now. That's correct. In hindsight, we know that. We know now how the Idaho Supreme Court would interpret the statute. Yes, Your Honor. Strict compliance. Or if you don't strictly comply, the evidence is not admissible. That holding – You know that now. That holding came down in Pukie v. Mabee, which was a 1920 case. This case simply reaffirmed Pukie v. Mabee and read the statutes. The statutes were clear on their face. Well, the Idaho Supreme Court in Matthews 2 says the law was unclear. In Matthews 2 – What were they referring to? With all due respect, in Matthews 2, the Idaho Supreme Court identifies this as a case of first impression. I don't believe that in that – I mean, it's the Idaho Supreme Court. And that's correct, Your Honor. And just because this is a case of first impression does not mean that the underlying law, which came from the statutes and came from the precedent, was unclear. A holding in the opposite direction would have been particularly surprising given the precedent of the Idaho Supreme Court and also given the Idaho statutes. Let me ask you this. You know, we have to look at what was confronting the counsel at the time of the events. Yes, Your Honor. Unfortunately – you know, unfortunately or beneficially now, we have the advantage of hindsight. We can see how the Idaho Supreme Court did this, interpreted these statutes. But, you know, if you look at it from counsel's perspective at the time all this was taking place, there was no law that said that a clerical mistake would result in all the evidence being excluded. He investigated. He made a reasoned judgment that he had a pretty good argument with respect to the – executing the warrant on the reservation. And lo and behold, he did pretty well with that because that argument was initially bought by the Idaho Supreme Court. Now, you know, lawyers have to make difficult choices. And he made a choice here. There was nothing here that suggested that the evidence would be excluded. Why does that show that his performance was deficient for constitutional purposes? Well, hindsight – yes, Your Honor. Hindsight is not required in this case because trial counsel himself in his sworn affidavit has testified that had he discovered the warrant was unsigned when it was executed, he would have filed a motion to suppress based on that fact. The testimony of David Nevin, the recognized expert in Idaho criminal law, has said that competent attorneys in Idaho would file a motion to suppress at the time based on the fact that the warrant was unsigned. And the status of the Idaho statutes, as well as the case Pookie v. Mabee, should have alerted trial counsel that suppression would have been viable based on these issues. And, again, trial counsel didn't even get that far. Trial counsel simply assumed an incorrect fact without any basis for his decision to do so. I'd like to take some of my time. Thank you. The police court. I think it's important to put this case in perspective. This is not a case where the state of Idaho is the great Satan walking into a house without a warrant and doing all kinds of misdeeds and bad things. We had an officer, yes, that did a minor thing in that he showed someone an affidavit because he mistakenly thought that the actual warrant was signed. But nobody in 1992 – But he realized at the scene that the warrant was not signed. That was a finding – Well, he knew it. He had to point to the affidavit. That was a finding of fact that was made by the trial court, Your Honor. His testimony – He misled the owner of the house. He did mislead the owner of the house by showing her the affidavit and not the actual warrant. But this Court is bound by that finding of fact by the trial court. And I understand that and I recognize that. And there's certainly sufficient evidence to accept that. But what we – That suggests that he knew that he had to have a warrant that was signed. I would respectfully disagree, Your Honor. What it demonstrated is that he was concerned about it, wanted to show her something, but not that he had to have an actual warrant in hand. Because at that time, the state of Idaho, no one knew that you had to have a warrant in hand that was actually signed. Counselors relied upon a number of cases – Did state law in Idaho at the time require a signed warrant? Your Honor, as has been discussed, Matthews II, the Idaho Supreme Court, specifically stated that it was an issue of first impression. They did say that, yet they cited his statutes and constitutional law that preexisted Matthews II. They did, Your Honor. They cited that. They said twice it was an issue of first impression. And, in fact, right under, I believe, on page 8 – I can't find it now – Matthews II, they're discussing the Idaho Code sections. And for a second time, they say this is first – this is the first case where this Court is urged to approve a warrant that has not – was not signed by a magistrate or a district judge. Now, if it was such clear law – and I realize that we have to follow that law now – but there were two dissenters on that Court that said no. If it was such clear law based upon the statutes at that time, why did we have two individuals on the Court dissenting and say, no, that's not the law in this State? There was clearly a conflict at that time. There was a conflict over what should happen in the event you didn't have a signed warrant. Yes, Your Honor. Actually, Your Honor, I think that there was more of a conflict than just what would happen. There was a conflict as to whether the rule was going to supersede the statute, which was going to supersede which, and whether the – whether Leon would apply or whether – Once you get beyond whether the rule supersedes the statute, and if you get to the statute, then the question is, what happens if it's a clerical mistake? And in Matthews II – Nobody claims that this was falsely signed, so it's a clerical – Absolutely not. It was a technical – it was a technical error, a technicality. It's an extraordinarily technical mistake. And, in fact, as discussed in the dissent by Justice Schroeder in Matthews II, subsequent to this particular case, you don't even need a doggone signature on the warrant, because you can call up and get a telephonic warrant, and the officers can then sign the warrant for the judge, and you take the warrant subsequently to the judge, and he will then sign the following day. So recognizing that statute doesn't apply in this particular case, it demonstrates just how technical this small mistake was, and it indicates why there is not ineffective assistance of counsel in this particular case. Well, why wouldn't – you know, my experience with defense counsel in serious cases like this, they pursue – a reasonably competent attorney would pursue all reasonable arguments. Yes, Your Honor. To make – just to put the State to the test. I think in serious cases – And we have the affidavit of the expert, and we have counsel's own affidavit that had – he realized that the affidavit had not been signed before the plea. He would never have let his client plead guilty until – unless testing the validity of the warrant. That is true, Your Honor. But it doesn't – Wasn't that a pretty serious mistake? No, Your Honor, it wasn't, because counsel are not required to do an exhaustive investigation. And admittedly, if we had known the real status of the law at that time, this hadn't – Matthew Stu hadn't been a case of first impression. That date on the warrant might have jumped out at counsel like a great big red flag. I'll bet it does, too. But at that time, you know, it's not going to jump out. That's not going to be something that's going to be a huge red flag at that time, because there was no law on the issue. But, yes. Following up on Matthew Stu, okay, that was unhabeas? That was collateral – collateral – seeking collateral relief in the State? Actually, Your Honor – Or was it a direct appeal? Actually, Your Honor, it was both. As I recall the record, you have Matthews 1, which was subsequently withdrawn by the Supreme Court because of the State's motion for reconsideration. And during the litigation of Matthews 1, Matthews filed post-conviction relief, and it was during – prior to Matthews 2 being issued, the direct appeal and the post-conviction collateral review were consolidated for purposes of appeal in Matthews 2 and were consolidated from there on out. Okay. So explain to me if Matthews 2 holds that the failure to have the signed search warrant vitiated the further search under that warrant. Why Matthews didn't get relief, i.e., having the evidence thrown out through the avenue of the State courts, and why are we here today? Because in Matthews 2 – well, let me back up even further. The trial court granted the State's motion for summary dismissal. There was no evidentiary hearing prior to the issuance of Matthews 2. Matthews 2 dealt with that issue and said, trial court, wrong. You need to – I can't remember. Actually, Matthews – now I've confused myself. There was an evidentiary hearing, and I can't recall if it was – it was after Matthews 1, and I can't recall if the big evidentiary hearing took place before Matthews 2 or not. I believe it did not, because Matthews – Matthews 2, they were concerned about the motion for summary dismissal. And the finding by the trial court that – it wasn't going to suppress it. It was more or less a prejudice determination by the trial court because of – it was a clerical error. He was going to apply Leon, those types of things. And, of course, we had Guzman come out about that time, which was a State decision saying, we're not going to apply the good faith exception in Idaho under Leon. And so that was the reason for Matthews 2, was to remand it so that evidence could be taken. Now, no other evidence was presented, and I recognize that. But that was the determination of the Idaho Supreme Court on that particular issue, was that we have to interpret this statute. District court, you have misinterpreted it. Therefore, take this interpretation of our statutes back and determine whether there was ineffective assistance of counsel. And the district – the trial court level said no, and that was – Trial court – trial court said no. It's not ineffective assistance of counsel. I'm not going to basically excise a very minute part of an overall investigation in this case and say, yeah, it's rather simple for Mr. Broody, trial counsel, to ask the single question of why is there a different date here. I'm going to look at the totality of the investigation that took place. I'm going to look at the various things that counsel were actually doing. He looked at all of the copies in the documents, the affidavits, the receipts, the inventories, the returns. He talked to both magistrates. Respectfully, I'll just admit there aren't a lot of defense attorneys, at least in Idaho, that talk to both the two magistrates. They simply talk to their client and the lawyer. Kagan. It gives the impression here that the counsel sort of knew the magistrates. Unquestionably, I think that's true. And he says one of the reasons he gave is, well, I knew the magistrates. So I just kind of, you know, I just kind of assumed that it was a clerical mistake. You know, I just didn't know the magistrate. Now, is that reasonable for a lawyer to do? I think in this particular situation. So he didn't pursue any further investigation. Once he recognized there was the mistake, no, he did not go further and say, gosh, why is there a mistake here. But we have to look at the totality of the investigation. So one could say that he did that because he knew the judge, didn't want to, you know, didn't want to put the judge in a bad light. Oh, I would submit, Your Honor, that isn't the reason that he was doing that was to didn't want to make the judge look bad. It was simply an assumption, a reasonable assumption, that it was simply a clerical mistake. And particularly since counsel didn't know the status of the law at that time, it wouldn't jump out and say, gosh, I better make sure it's a clerical mistake. It was a reasonable assumption to assume that. I mean, he explored. Is it reasonable not to interview Matthew's sister about the search? We don't know from the record that we have if that took place or not. Matthew's sister testified at the evidentiary hearing, but Brody did not. We know from Donna Henry's testimony that she claimed to have spoken with counsel, but we don't know when, we don't know how many times, we don't know the subject matter of the conversations. And I would fault counsel at the evidentiary hearing or Matthews at that point in time because the burden is his in an ineffective assistance of counsel claim. There's a presumption that it was properly done and did not call Jeff Brody, I think, falls against Matthews in this case. We certainly can't make any assumptions about what he would have testified to, but I certainly believe that it's something that should have. I question why. David, that he submitted, was submitted as part of this evidentiary hearing? Actually, that affidavit, as I recall, I don't recall, Your Honor. I apologize. I don't recall exactly when it was. I think it was prior to the evidentiary hearing. But it was in State court. It was in State court that it was filed. Yes, it was. Which does bring me to the affidavit of Mr. Nevin. Mr. Nevin's affidavit was not submitted to the State court. And quite frankly, I recognize such affidavits are admissible in Federal habeas cases, but the question of whether there is deficient performance is a question of law. And simply because one lawyer says, yeah, I'd have done this, doesn't mean that every lawyer in Idaho is going to do this or any other State. Mr. Nevin doesn't indicate in his affidavit that he spoke with Mr. Brody or that there was a great deal or any of what Mr. Brody did as far as his interviewing of the magistrates, his interviewing of law enforcement officials. Mr. Brody signed this affidavit on the 30th of December 1993. Just from your own recollection, do you recall what events were taking place? I believe that that was the filing of the post-conviction relief case, Your Honor. The post-conviction relief case was actually filed. So he just submitted the affidavit in support of the petition. That's my understanding, Your Honor. It was March 19th, 1993 that the post-conviction case was filed. So I am assuming that Mr. Brody's affidavit was filed. And that's all we hear from Mr. Brody through all the years of this case. We don't even hear from him in Federal district court. That's the sum total of the information regarding what he did. Well, the heart of what he says is basically that he just thought it was a clerical mistake. And I understand and accept that, Your Honor, but I don't think we can exercise that part of his investigation. I think we have to look at the totality of the investigation that was done regarding the warrants that were issued in this particular case. As to the Nippoo and Brady claims, I have a hard time with these two claims specifically because, like Mr. Brody didn't know what the law was, neither did the State. And until the Idaho Supreme Court said this is the law in Matthews 2, there wasn't any exculpatory evidence here. There was nothing. There was no bad faith on anybody's part. In fact, the only information that we have regarding the State's knowledge of the date is an affidavit from a deputy prosecutor that says, yes, I knew that the date was different, but we have no information that anybody thought anything of it. Above and beyond that, respectfully, we would submit that the Brady and the Nippoo claims are new law, and this Court should not address them under Teague. We have cited a number of cases. I think it's important to understand the second prong of Teague analysis, and that is finality, because counsel has talked about the fact that a number of the cases we cited were cited after the Idaho Supreme Court issued its opinion in Matthews 3. That's true. So what? Finality is at the time that the United States Supreme Court denied certiorari, and those opinions were issued prior to that date. That's the key issue right there is finality. The importance of Tolman from this Court and this Court's statement that when there's a split in the circuits that there — that you can't overcome the burden in Teague is the statement, I believe it's in Lambrix, that no jurist, reasonable jurist, would find an alternative view. And there is certainly an alternative regarding the Brady and the Nippoo claims in the context of suppression issues and guilty pleas, particularly in light of the United States Supreme Court's decision in Ruiz. And I realize Ruiz can be narrowly read, but if the United States Supreme Court has crafted an exception for Brady for the purposes of affirmative defenses and impeachment evidence, I would respectfully submit that there is also an exception in Brady in the Can we say that Mr. Brody made a reasonably informed decision not to file a motion to suppress before his — on this issue before he let his client plead guilty? I believe it is a — yes, Your Honor. I think it was reasonable not to file the motion to suppress on the issue of the signature. He didn't assess whether — I mean, there's nothing here to indicate that he assessed whether, you know, he had a reasonably good motion. I mean, he just didn't do it. I mean, there's nothing to indicate to me that, you know, he said, well, this is a clerical error, and under Idaho law, it's not clear. I have a good argument here, and I think I'm just going to concentrate my efforts on this argument that, you know, it's dynamite. There's no evidence before us, Your Honor, that Mr. Brody made that type of a tactical decision that I'm going to focus on this versus this. We don't have that evidence before us because Mr. Brody was never called as a witness. You're correct. That is correct. But when you look at the totality of his investigation and the fact that there was no law in Idaho on this issue, that decision was reasonable. It didn't — there was no reason really to question that. And I recognize now, with 20-20 hindsight, that Mr. Brody would have filed that motion. But counsel are not required to be psychics. They're not required to anticipate what the law is going to be. And in this case, it was an issue of first impression, and counsel — it was reasonable for him not to file the motion in this case. When was Matthews 2? Is it Matthews 2, when the Supreme Court makes that decision? Yes, it was, Your Honor. That came down in 97. And I have it before me, I thought, but it's — I have mislaid it. But he says in 93 that he would have filed. Yes, Your Honor, he does. Yes, he does. And Matthews 2, you're correct, Your Honor, was issued in 97. Yes, it was. Thank you. All right, thank you, counsel. Thank you, Your Honors. A few points, Your Honors, and I'll try to be brief. As regards why this case is here today, after Matthews 2, the Idaho Supreme Court ruled that Matthews' remaining issues were moved. In between Matthews 2 and Matthews 3, there was a judicial election in Idaho. The dissent from Matthews 2 became the majority in Matthews 3. The fact that the police officer could have telephoned the judge points out why the police officer should not have resorted to deception. And this case should not be here today because the police officer should have followed the The status of the law has nothing to do with Matthews' NAPU claims. The NAPU clearly ñ NAPU just stands for the proposition that the State should correct false findings of fact. There was a false finding of fact that these warrants were issued on January 13th and not January 14th. I see I'm out of time, so if there's no further questions. Okay. Thank you, counsel. And I do want to thank the legal interns and supervising attorney for taking on this representation. You did an excellent job. Thank you. Thank you very much. Court is adjourned. All rise. This court for this session stands adjourned. Thank you.  Thank you.
judges: Noonan, Wardlaw, Paez